UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARCUS EBERHART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13CV940 CDP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Marcus Eberhart's application for disability insurance benefits under Title II of the

Act, 42 U.S.C. §§ 401 et seq., and for supplemental security income (SSI) benefits

based on disability under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et

seq. Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3),

provide for judicial review of a final decision of the Commissioner. Eberhart claims

he is disabled because of stents, high blood pressure, diabetes, and high cholesterol.

Because I find that the decision denying benefits was supported by substantial

evidence, I will affirm the decision of the Commissioner.

## Procedural History

Eberhart filed his applications for benefits on August 25, 2009. He alleges

disability beginning July 15, 2007. On March 28, 2011, an ALJ issued a decision

that Eberhart was not disabled.  The Appeals Council of the Social Security Administration (SSA) remanded his case for further consideration and a new decision on September 1, 2011.  On March 26, 2012, following a hearing, the ALJ again concluded that Eberhart was not disabled.  The Appeals Council denied his request for review on April 9, 2013.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In his application for benefits, Eberhart stated that he was born in 1964 and has a high school education, plus two years of college.  (Tr. 193, 245).   He is 6'3" tall and weighs 265 pounds.  (Tr. 238).  Eberhart also completed an Adult Function Report in conjunction with his application for benefits on September 21, 2009.  In it, he described his daily activities as taking a shower and medication, then preparing his meals for the day.  He states, "I'm also very depression because I'm not able to do what I used to do."  His teenage son helps with household chores.  Eberhart cleans house, does laundry, and mops and sweeps some, but his chest hurts and he gets short of breath.  Eberhart shops, pays bills, and handles money.  He reads, goes to church and sporting events, watches movies, and visits friends and family, but he can no longer play sports or lift weights.  Eberhart claims his medication causes light headedness.  He has trouble lifting, squatting, bending, standing, walking, sitting,

kneeling, talking, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, using his hands, and with sexual activity. Eberhart can walk half a block before needing to rest for 15 minutes. He follows directions and gets along with authority figures, but he does not handle stress well. Eberhart "fear[s] [his] health [will] cause [him] to have heart surgery . . and [he] may die." (Tr. 261-68).

<u>Medical Records</u>

Eberhart was seen at St. Louis ConnectCare cardiology on March 5, 2009, for evaluation. He denied any chest pain or shortness of breath. The clinical impression was coronary artery disease - stable and status post stenting. (Tr. 319-20).

Eberhart was given a radionuclide cardiac stress and rest test on April 1, 2009. The clinical impression was mild to moderate myocardial ischemia on the lateral, inferolateral wall and a 41 % ejection fraction of the left ventricle. (Tr. 317). He was also given an exercise stress test, which was positive for ischemia. During the test, Eberhart was given nitroglycerin for elevated ST changes. (Tr. 318).

Eberhart had a follow-up visit at St. Louis ConnectCare on May 7, 2009, to discuss his stress test results. He denied any chest pain or shortness of breath. (Tr. 315).

On June 5, 2009, Eberhart underwent a cardiac catheterization by Alan J, Tiefenbrunn, M.D., for reevaluation of coronary artery disease. It was noted that

Eberhart had undergone a bare metal stenting of the left anterior descending coronary artery, the diagonal branch, and circumflex coronary artery in October of 2008. His medical history also included diabetes, elevated lipids, and a positive family history for premature coronary artery disease. Eberhart presented with increasing symptoms of dyspnea on exertion. Dr. Tiefenbrunn found an elevated left ventricular end diastolic pressure, with the left ventricle dilated and thick walled with global hypokinesis and an ejection fraction of 40%. The stented segments of the left anterior descending coronary artery, the diagonal branch, and the circumflex vessel were free of high grade restenosis, but Dr. Tiefenbrunn found new high grade segmental narrowing involving the origin of the circumflex coronary artery and its mid portion. Dr. Tiefenbrunn determined that these lesions were amenable to percutaneous revascularization. (Tr. 370).

Eberhart was admitted to Barnes Jewish Hospital on August 6, 2009, for chest pain and non ST elevation myocardial infarction. Eberhart reported a burning sensation in his chest, lightheadedness, and some shortness of breath while watching television. He had no paroxysmal nocturnal dyspnea, no orthopnea, no sycope, and no palpitations. Eberhart reported that he quit smoking about one year ago. Examination revealed blood pressure of 140/82 and a heart rate of 74. He was noted to be pleasant and overweight, with regular breathing rate and rhythm, clear lungs, a soft, nontender abdomen, and no peripheral edema in his extremities. Eberhart was

successfully given two drug eluting stents.  His lipids were noted to be within appropriate limits, but he was advised to continue on a statin and try to include his HDL component and drop his LDL component.  Eberhart's diabetes was noted to be under control, but his hypertension was still elevated and required continued use of a beta blocker and ace inhibitor.  (Tr. 327-29).

While in the hospital, Eberhart underwent a cardiac catheterization.  The diagnostic impressions were complex 90% ostial circumflex, 70% mid circumflex, and 99% subtotal occlusion of the distal corcumflex/LPL system, with status-post successful PTCA/ stent placement with two drug-eluting Xience V stents.  It was recommended that Eberhart take aspirin indefinitely and plavix for at least a year. (Tr. 332-34).

Eberhart was evaluated by the Cardiovascular Division of Washington University's School of Medicine on August 24, 2009.  He was noted to have coronary artery disease, hypertension, hyperlipidemia, obesity, and a strong family history of premature coronary artery disease.  Eberhart had increased exertional dyspnea, but his chest pain and shortness of breath had markedly improved, with no orthopnea, PND, lightheadedness, syncope, or palpitations since August 6, 2009. Eberhart reported shortness of breath during ambulation and rare nighttime chest symptoms that disappeared as soon as he sat up.  Physical examination was normal, with regular heart rate and rhythm and no peripheral edema in his extremities.  The

clinical impression was stable coronary artery disease with three drug-eluting stents for his significant LAD and circumflux disease, appropriate blood pressures, controlled diabetes, and a significantly decreased LDL. It was also noted that Eberhart had stopped smoking. Diet and exercise strategies were discussed with him, and it was suggested that he try cardiac rehabilitation. (Tr. 354-55).

Eberhart had a follow-up visit with St. Louis ConnectCare cardiology on November 23, 2009. He was noted as having coronary artery disease with multiple stents, dyspnea and fatigue, high blood pressure, obesity, and diabetes, but no angina or congestive heart failure. Eberhart was advised to exercise regularly. (Tr. 427-28).

Eberhart underwent a stress test/rest study by St. Louis ConnectCare on January 27, 2010. The impression was a very minimal, subtle, equivocal degree of myocardial infraction at the distal anterior and posterolateral wall. The ejection fraction of the left ventricle was estimated at 56%, with no hypokinesia, dyskinesia, or akinesia of wall motion of the ventricle. (Tr. 465). During a follow-up visit on February 8, 2010, the results of the stress test were discussed with him. No further testing was ordered, but Eberhart was advised to diet and engage in gradual aerobic exercise. (Tr. 466-67).

Treatment records from Washington University's School of Medicine dated April 23, 2010, indicate that Eberhart enrolled in a study called "Cardiac Risk Markers and Unremitting Depression in Acute Coronary Syndrome." The stated

purpose of the study was to determine if treating depression in cardiac patients improved other medical risk markers. (Tr. 459). According to Iris Csik, a licensed clinical social worker, Eberhart participated in the study from April through August of 2010. As part of the study, Eberhart met with Ms. Csik, LCSW, for 13 in-person cognitive behavior therapy sessions. At the time of his enrollment, Eberhart's Beck Depression Inventory score was 36, which Ms. Csik stated was indicative of severe depression. In addition to his therapy sessions, Eberhart was also given antidepressant medication for eight weeks as part of the study treatment. In Ms. Csik's opinion, Eberhart's depression "had not fully remitted" at the conclusion of the study. Therefore, she recommended that Eberhart seek additional treatment for depression from his physician and community resources. (Tr. 472-73).

Eberhart missed his appointment on August 16, 2010, but was seen by Joseph Ruwitch, M.D., on October 26, 2010, for cardiac follow-up and chest pain. Eberhart described having left-sided, dull, achy, chest pain that radiated down his arm. His pain level was three out of 10. Eberhart said he had some sweating, but no nausea or vomiting. Eberhart experienced the pain and shortness of breath during exertion. He also reported an intentional 12 pound weight loss. Upon examination, Eberhart's chest was clear and his heartbeat was regular with no murmur. There was no edema in his extremities. An electrocardiogram revealed normal sinus rhythm. Dr. Ruwitch's assessment was high blood pressure controlled, coronary artery disease

status post stents, non-specific dyspnea, diabetes mellitus treated with oral medication, lipid disorder, and disability applicant.  Eberhart's anti-depressant prescription was renewed, and Eberhart was "reassured."  Dr. Ruwitch recommended against stress scanning and told Eberhart to schedule a six month follow-up visit. (Tr. 582-83).

In connection with his claim for benefits, Eberhart was examined by consultative physician Saul Silvermintz, M.D., on November 23, 2010.  Dr. Silvermintz identified Eberhart's chief complaints as heart with six stents, high blood pressure, diabetes, and high cholesterol.  Upon examination, Eberhart's lungs were clear, his cardiac rhythm and rate were regular with no thrills, murmurs, or rubs, there was no swelling or edema in his extremeties, and his gait was normal.  Eberhart could walk on his heels and toes, and he got on and off the examination table without difficulty.  Eberhart had no problem with fine finger movements.  Dr. Silvermintz's impression was hypertension controlled with evidence of end organ damage, status post myocardial infarction with stent placement, history of elevated cholesterol, and diabetes mellitus type 2 under fairly good control.  (Tr. 479-81).

Dr. Silvermintz also completed a medical source statement of ability to do work-related activities (physical).  He indicated that Eberhart could occasionally lift and carry up to 10 pounds, sit for eight hours at a time without interruption, stand for 30 minutes at a time, and walk for 10-15 minutes.  Dr. Silvermintz opined that, in an

eight hour work day, Eberhart could sit for eight hours, stand for two hours, and walk for one hour. Eberhart could occasionally reach and operate foot controls, frequently handle or finger, continuously feel, and never push or pull. Dr. Silvermintz believed that Eberhart should never crawl or climb stairs, ramps, ladders, or scaffolds, and that he should only occasionally balance, stoop, kneel, or crouch. As for environmental limitations, Eberhart should never be exposed to unprotected heights or extreme cold, and should only occasionally be exposed to extreme heat, moving mechanical parts, humidity, dust, odors, fumes, and pulmonary irritants. Dr. Silvermintz stated that Eberhart could frequently operate a motor vehicle and be exposed to vibrations. Dr. Silvermintz opined that Eberhart could shop, travel without a companion, ambulate without assistive devices, walk a block at a reasonable pace on rough surfaces, use public transportation, climb a few stairs without the use of a hand rail, prepare meals and feed himself, groom himself, and handle paper files. Finally, Dr. Silvermintz indicated that Eberhart's limitations had not lasted or would not last for 12 consecutive months. (Tr. 482-87).

Eberhart was also evaluated by licensed psychologist Summer Johnson in connection with his claim for benefits. Ms. Johnson identified Eberhart's chief complaints as depression and a possible learning disability. Eberhart told her he had problems accepting that he was depressed. He reported mood swings, occasional crying spells while watching the news, and feeling sad on some days for no reason.

Eberhart stated that his head hurt and that he felt depressed over bad news or thinking about things he can no longer do or control. Eberhart was no longer interested in working out, socializing, and sexual activity. Eberhart reported trouble sleeping and feelings of guilt and low self-esteem. His appetite decreased and he lost about 30 pounds in two months. Eberhart admitted that he previously had thoughts of self-harm and homicidal ideation. Ms. Johnson noted that Eberhart was currently on an anti-depressant and was using cue cards to improve his mood. Eberhart believed the medications only worked sometimes. Eberhart disclosed a family history of mental illness, including an attempted suicide by a sibling. (Tr. 493-94).

Ms. Johnson observed Eberhart to have adequate hygiene and grooming, an alert facial expression, good eye contact, and normal motor activity, posture, and gait. Eberhart was able to relate appropriately to Ms. Johnson and was cooperative. His affect was bright and he was fully oriented. There was no evidence of preoccupations, thought disturbances, perceptual distortions, delusions, hallucinations, or current suicidal or homicidal ideation. Eberhart's judgment and insight were good, and he was able to complete serial 3s at a moderate pace. His proverb interpretation was poor. Eberhart scored within normal limits on the Trail Making Test, but his results on the Minnesota Multiphasic Personality Inventory test were invalid due to his overreporting of symptoms. Eberhart demonstrated good concentration, good persistence, and a moderately fast pace during the examination.

Ms. Johnson diagnosed Eberhart with major depressive disorder, recurrent, mild, with an Axis V GAF score of 67. Ms. Johnson believed that Eberhart was experiencing mild problems with his mood, and that his prognosis was good with appropriate intervention. (Tr. 495-98).

After examining Eberhart, Ms. Johnson completed a medical source statement of ability to do work-related activities (mental). She opined that Eberhart would have mild difficulty carrying out complex instructions, but otherwise would have no difficulty understanding, remembering, and carrying out simple instructions, making simple work-related decisions, understanding and remembering complex instructions, and making complex work-related decisions. Ms. Johnson stated that Eberhart had a slight impairment in immediate memory and manipulation of information which might impact his ability to carry out complex instructions. She found mild difficulties with Eberhart's ability to interact appropriately with the public, supervisors, co-workers, and with his ability to respond appropriately to work situations and changes in routine as she believed Eberhart was isolative and kept to himself. Ms. Johnson agreed with Dr. Silvermintz that Eberhart could engage in daily activities and that his limitations had not lasted or were not expected to last for 12 months. (Tr. 499-501).

Eberhart next saw Dr. Ruwitch on April 5, 2011, for chest pain. Eberhart told Dr. Ruwitch that he had remitting and relapsing sharp left sided chest pain which

occurred four to six times per day and lasted 10 to 15 minutes.  He also complained of some shortness of breath, exertional dyspnea after walking, and edema.  Eberhart denied any wheezing or cough.  Dr. Ruwitch's examination of Eberhart yielded normal results.  Dr. Ruwitch prescribed metoprolol succinate and "reassured [Eberhart] at length."  Dr. Ruwitch believed that Eberhart's chest pain was primarily "extra cardiac in origin."  (Tr. 584-86).

Eberhart followed up with Dr. Ruwitch on May 16, 2011.  Eberhart reported being constantly fatigued.  He was still experiencing chest pain but described it as "maybe 50% improved."  Eberhart told Dr. Ruwitch he was scared because of his stents and that he had ongoing depression.  Dr. Ruwitch examined Eberhart, and the results were normal.  Dr. Ruwitch assessed coronary artery disease status post stents/angina ongoing with improvement, high blood pressure controlled, obesity, and anxiety syndrome.  Dr. Ruwitch noted that the source of Eberhart's chest pains was an "unclear issue" and that he was going to "get more aggressive with medications" now as a result.   Dr. Ruwitch continued Eberhart's prescription for metoprolol succinate, prescribed lisinopril, and ordered a stress test.  (Tr. 589-90).

Eberhart underwent a myocardial perfusion imaging study on June 29, 2011.  Findings revealed normal activity in the left ventricular cavity with a small perfusion abnormality of mild severity in the inferoapical wall in both stress and rest images.  The left ventricular ejection fraction was estimated at 54%.  No dyskinesia or

hypokinesia was demonstrated. Small infarct was to be considered in the apiocoinferior wall. (Tr. 593-94).

Dr. Ruwitch completed a cardiac residual functional capacity questionnaire in connection with Eberhart's application for benefits on July 19, 2011. He stated that Eberhart had been his patient for two years. Dr. Ruwitch diagnosed Eberhart with coronary artery disease with multiple cardiac stents, high blood pressure, and diabetes. He listed Eberhart's symptoms as chest pain and fatigue and indicated that Eberhart also experienced occasional atypical non cardiac chest pain. He believed that Eberhart's symptoms were stress-related, but that he could tolerate moderate work stress. Dr. Ruwitch also noted that Eberhart's physical symptoms caused chronic anxiety and depression. Dr. Ruwitch indicated that Eberhart's cardiac symptoms would only seldom interfere with his attention and concentration. Dr. Ruwitch believed that Eberhart's impairments lasted at least twelve months, and his prognosis was guarded. As for Eberhart's functional limitations, Dr. Ruwitch opined that Eberhart could walk one block without rest, sit for two hours, stand for 10 minutes without rest, and occasionally lift 20 pounds, twist, stoop, crouch, and climb stairs and ladders. Dr. Ruwitch believed that Eberhart should avoid concentrated exposure to extreme temperatures and conditions. He believed that Eberhart would infrequently need to take unscheduled breaks of 15 minutes during an eight-hour work day. Finally, Dr. Ruwitch said that Eberhart's impairments were likely to

produce good days and bad days, resulting in his absence from work about two days per month.  (Tr. 634-40).

Eberhart went to St. Louis ConnectCare on July 19, 2011, and saw Dr. Ruwitch for his stress test results.  During that visit he complained of chest pain, shortness of breath after walking half a block, sweating with diapharesis lasting 20-30 minutes, morning nausea, and evening palpitations.  (Tr. 630).  Dr. Ruwitch classified these as the "same variety of complaints."  Dr. Ruwitch "doubt[ed] [that] chest pains are of cardiac origin now, in lack of ischemia confirmation."  Therefore, he "reassured [Eberhart] liberally" with the results of the stress test.  Dr. Ruwitch encouraged Eberhart to gradually increase his exercise and concluded that Eberhart's medications were in order.  No further tests were ordered.  (Tr. 595-96).

Eberhart went to the Grace Hill Medical Clinic on September 13, 2011, for diabetes and heartburn.  His weight at that time was 264 pounds, resulting in a BMI of 32.56.  (Tr. 576).  He returned to the clinic on September 26, 2011, complaining of dry, itching plantar skin and burning pain with numbness.  Examination was within normal limits except for some dry skin on his feet.  Eberhart was given some creams for the itching and dryness.  (Tr. 577-78).

Eberhart returned for a follow-up visit with Dr. Ruwitch on October 4, 2011. Eberhart said his chest pains were "a little lighter . . . like fluttering."  He also complained of leg pains, which were reportedly diabetic symptoms.  Dr. Ruwitch

noted that Eberhart was on an anti-depressant and "very motivated to have multiple complaints." Eberhart's physical examination was normal, except for "dirty and scaly feet." Dr. Ruwitch warned Eberhart to take care of his feet and reassured him about his heart and legs. Eberhart was urged to exercise. (Tr. 598-600).

Eberhart saw Dr. Ruwitch again on January 9, 2012. His assessment was coronary artery disease, essential hypertension, and hyperlipidemia. Dr. Ruwitch examined Eberhart, and found normal heart sounds and pulses, no edema, and normal chest sounds. Eberhart was counseled to lose weight. Dr. Ruwitch noted no cardiac changes and stated that chest pains were non cardiac. (Tr. 603-06).

<u>Testimony</u>

During a hearing held before the ALJ on February 22, 2012, Eberhart testified that his medications make him nauseous and tired. Eberhart sees a doctor for numbness in his right side, chest pain, and shortness of breath. Eberhart's fingers tingle and he has a burning sensation in the right side of his body. He has chest pains daily, from five to eight times per day, with shortness of breath and an irregular heart beat. When this happens, he tries to calm down and then takes an extra 325 Bayer aspirin if needed. Eberhart vomits every morning when he wakes up. He takes three to five naps daily. (Tr. 29-38).

Annie E. Winkler, M.D., also testified at the hearing as a non-examining consultative physician. After reviewing the medical records, Dr. Winkler opined

that Eberhart suffers from diabetes, hypertension, and coronary artery disease. She also testified that "he does appear to have some ongoing psychological issues and there's been concern that his complaints of chest pain have really been more related to anxiety and medication rather than from cardiac basis." (Tr. 39-40). Dr. Winkler believed that Eberhart should be limited to lifting/carrying 20 pounds occasionally, 10 pounds frequently, and standing or walking no more than two hours in an eight hour day with no limitations on sitting. According to Dr. Winkler, Eberhart should only take stairs, bend, stoop, crouch, and crawl occasionally. He should never climb ladders, ropes, or scaffolds, and he should avoid concentrated exposure to cold, heat, wetness, humidity, and unprotected heights. (Tr. 40). When asked about any limitations based on Eberhart's psychological problems, Dr. Winkler stated that "it does appear that his psychological problems are pretty, are interfering with daily functioning." She believed that his anxiety might create interference with work duties. (Tr. 41). Dr. Winkler was then asked if she agreed with Dr. Ruwitch's assessment of Eberhart's RFC. Winkler stated that she did, except she believed that Eberhart should not climb ladders, ropes, or scaffolds, and that his cardiac symptoms would not result in unscheduled breaks. (Tr. 41). Dr. Winkler clarified that any unscheduled breaks might be related to psychological problems, but that she was hesitant to make such a diagnosis as she was not a mental health professional. (Tr. 42).

However, Dr. Winkler explained that any claimed fatigue and chest pain were not due to cardiac issues, even though they might be related to anxiety or psychological issues. (Tr. 42-43).

Vocational expert Elvira Gonzalez also testified at the hearing. The ALJ asked the vocational expert if there were any jobs that a hypothetical individual with Eberhart's education, training, and work experience could perform if that individual were also limited by an ability to lift 20 pounds occasionally and 10 pounds frequently, stand/walk for two hours out of eight, sit six hours out of eight, climb stairs and ramps occasionally and a need to avoid extreme temperatures and hazards and change positions frequently. Ms. Gonzalez responded that such an individual could work as an information clerk or call out operator. Ms. Gonzalez further testified that an individual with those limitations would be unable to work as a call out operator if the mental limitations were added to the hypothetical: understanding, remembering, and carrying out simple instructions; making simple work related decisions; adapting to simple work changes; and, performing work at a normal pace without production quotas. However, that individual would still be able to work as an information clerk or a surveillance system monitor. Finally, the ALJ added the additional limitation that the individual would have at least two absences per month due to physical or mental limitations. With that added limitation, the vocational expert testified that "at that rate absenteeism the person

would have great difficulty maintaining employment . . . ."  (Tr. 44-49).

Eberhart's attorney posed the following hypothetical question to Ms. Gonzalez:

> Could I ask you to assume a hypothetical individual of Mr. Eberhart's age, education and work experience who could, has the capacity to walk about a block without rest, sit about two hours before he has to get up, and stand about 10 minutes and then he'd need to sit down, he would have unscheduled breaks lasting 15 minutes and these would be unscheduled, unpredictable so he would be off task, at least once or twice a day, this would happen.  With those restrictions, would he be able to do the info clerk or surveillance system monitor?

(Tr. 49-50).  Ms. Gonzalez responded, "No."  (Tr. 50).

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently.  Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-

adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

## **The ALJ's Findings**

The ALJ issued his decision that Eberhart was not disabled on March 26, 2012.  He found that Eberhart had the severe impairments of diabetes mellitus, hypertension, coronary artery disease, and hyperlipidemia.   The ALJ found that Eberhart retained the residual functional capacity to perform light work, in that he could lift 20 pounds occasionally and 10 pounds frequently, stand for two hours and sit for six hours out of an eight hour workday, and that he needed a sit/stand option with the ability to change positions frequently, could only occasionally climb ladders, ropes, and scaffolds, kneel, crouch, or crawl, and that he should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and hazards such as heights.  In fashioning Eberhart's RFC, the ALJ determined that his impairments could be expected to produce his alleged symptoms; however, he concluded that Eberhart's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible to the extent they were inconsistent with his RFC.   The ALJ relied on the vocational expert's testimony to determine that Eberhart was unable to perform his past relevant work but that he could work as an information clerk and call-out operator.  Therefore, he concluded that Eberhart was not disabled.

## Discussion

Eberhart contends that the ALJ's RFC was not based upon substantial evidence. RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth Circuit has noted the ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The record must include some medical evidence that supports the RFC. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000).

Eberhart argues that the RFC is not supported by some medical evidence because the ALJ failed to include absenteeism as one of Eberhart's limitations. In the cardiac residual functional capacity assessment, Dr. Ruwitch indicated that Eberhart's impairments were likely to produce good days and bad days, resulting in his absence from work about two days per month. (Tr. 634-40). While Dr. Winkler did not specifically address this limitation, she testified that she disagreed with Dr. Ruwitch's assessment in that Eberhart's cardiac symptoms would not

result in unscheduled breaks.  (Tr. 41).  Dr. Winkler then clarified that any unscheduled breaks might be related to psychological problems, but that she was hesitant to make such a diagnosis as she was not a mental health professional.  (Tr. 42). However, she thought Eberhart's anxiety might create interference with work duties.  (Tr. 41).  The vocational expert testified that being absent two days per month would make it very difficult to maintain employment.   (Tr. 44-49).

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'"  Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).  The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  However, the opinion of the treating physician should be given great weight only if it is based on sufficient medical data.  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by

any explanation).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole."  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

Here, the ALJ properly formulated Eberhart's RFC only after considering all of the relevant evidence, including the medical evidence.   The ALJ discussed at length the opinions of Eberhart's treating cardiologist, along with those of Dr. Winkler and Dr. Silvermintz, when formulating Eberhart's RFC.  He gave "great weight" to the opinions of Dr. Ruwitch and Dr. Winkler as consistent with each other and the medical evidence of record, but he was not required to include every limitation set out by Dr. Ruwitch in his RFC determination.  In fact, the ALJ adopted most of the limitations set out by Dr. Ruwitch when deciding that he could perform a range of light work.  However, he rejected those limitations which were inconsistent with the record as a whole, and it was not error for him to do so.  For example, the ALJ agreed with Dr. Winkler's more restrictive limitation on climbing ropes, ladders, or scaffolds, and included that restriction in the RFC.  He also agreed with Dr. Winkler, not Dr. Ruwitch, that Eberhart would not need to take unscheduled breaks due to his physical limitations.  The ALJ found that Dr. Winkler's opinion was actually consistent with Dr. Ruwitch's treatment notes which stated that Eberhart's chest pain was due to anxiety or depression and not cardiac in nature, and that finding is supported by substantial evidence on the

record as a whole. Although Dr. Ruwitch does not specify whether he believed Eberhart's absenteeism would be for physical or mental reasons, he provides no clinical and laboratory findings supporting this opinion as to either type of impairment.[1] No other physician or mental health professional opined that Eberhart would suffer from absenteeism.

When the evidence is considered as a whole, I find that the ALJ did not substantially err in refusing to include absenteeism as a limitation in his RFC. The ALJ properly found that Eberhart's mental impairment was not severe after consideration of all the medical evidence of record, including that of the examining consultative psychologist.[2] In addition Dr. Ruwitch opined that Eberhart was capable of tolerating work stress and that his experience of cardiac

---

[1]When the assessment as a whole is considered with Dr. Ruwitch's treatment notes, it appears that Dr. Ruwitch believed any absenteeism would be caused by psychological factors, not physical ones.

[2]Eberhart does not argue that the ALJ erred when he found Eberhart's depression was not a severe impairment. To the extent Eberhart's throw-away line that "the decision fails to articulate a legally sufficient rationale relative to [his] mental impairments" could be construed as an argument that the ALJ should have included mental limitations in his formulation of the RFC, it is rejected. The ALJ discussed the medical evidence of Eberhart's depression at length and concluded that it was not severe. This fnding is well supported by the opinion of Ms. Johnson, who concluded that Eberhart had only mild mental limitations, and the treatment records of Dr. Ruwitch. In addition, the ALJ explained why he rejected Dr. Ruwitch's opinion with respect to the unscheduled break limitation caused by non cardiac chest pain. He stated that Dr. Ruwitch was not a psychologist or psychiatrist, and to the extent his opinion conflicted with that of the mental health professional's, it was rejected as not supported by medical evidence. The same reasoning applies here to the extent that Dr. Ruwitch's opinion regarding absenteeism is attributable to Eberhart's non cardiac chest pain, anxiety, or depression, and is well supported by the record as a whole.

symptoms, including a psychological preoccupation with his cardiac condition, would only seldom interfere with his attention and concentration. On July 19, 2011, the same date that Dr. Ruwitch completed the cardiac residual functional capacity assessment, Dr. Ruwitch expressed his doubt that Eberhart's "chest pains are of cardiac origin now, in lack of ischemia confirmation." On October 4, 2011, after his examination of Eberhart yielded normal results, Dr. Ruwitch noted that Eberhart was on an anti-depressant and "very motivated to have multiple complaints." On January 9, 2012, Dr. Ruwitch again found no cardiac changes in response to Eberhart's complaints of chest pain and noted that the chest pains were non cardiac. Ms. Johnson concluded that Eberhart had only mild limitations in his ability to carry our complex instructions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting.

As for Eberhart's physical impairments, the evidence shows that while Eberhart underwent several stenting procedures, he responded well to treatment. Eberhart was seen at St. Louis ConnectCare cardiology on March 5, 2009, for evaluation  post-stenting and denied any chest pain or shortness of breath. After a cardiac stress and rest test on April 1, 2009, revealed mild to moderate mycardial ischemia, Eberhart denied any chest pain or shortness of breath during his follow-up visit. Eberhart did undergo another stent placement on August 9, 2009, while

hospitalized for chest pain and non ST elevation myocardial infarction, but during his follow-up visit on August 24, 2009, his chest pain and shortness of breath had markedly improved, with no orthopnea, PND, lightheadedness, syncope, or palpitations. His physical examination at that time was normal, with regular heart rate and rhythm and no peripheral edema in his extremities. A stress test/rest study on January 27, 2010 revealed only a very minimal, subtle, equivocal degree of myocardial infraction at the distal anterior and posterolateral wall. Despite reporting chest paint to Dr. Ruwitch on October 26, 2010, Eberhart's chest was clear, his heartbeat was regular with no murmur, and there was no edema in his extremities. An electrocardiogram revealed normal sinus rhythm. Dr. Silvermintz's consultative examination of Eberhart on November 23, 2010, revealed clear lungs, regular cardiac rhythm and rate with no thrills, murmurs, or rubs, and no swelling or edema. Eberhart's examinations by Dr. Ruwitch on April 5, 2011, and May 11, 2011, were again normal despite Eberhart's complaints of increased chest pain. Dr. Ruwitch ordered a stress test on June 29, 2011, which was normal with no dyskinesia or hypokinesia and confirmed his belief that Eberhart's chest pain was non cardiac in nature. Dr. Ruwitch examined Eberhart in follow-up appointments on July 19, 2011, October 4, 2011, and January 9, 2012, and each time the results were normal despite Eberhart's reported chest pain.

The opinion of the treating physician should be given great weight only if it is based on sufficient medical data. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data) (internal quotation marks and citation omitted). Here, Dr. Ruwitch's conclusory opinion regarding absenteeism is not entitled to great weight as it is inconsistent with his treatment notes and the other, uncontraverted objective medical evidence of record. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.") (internal quotation marks and citations omitted); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (an ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical

evidence) (citing <u>Vandenboom</u>, 421 F.3d at 749).

The ALJ did not simply adopt a light work RFC wholesale. Instead, he formulated Eberhart's RFC after careful consideration of all the relevant evidence, including the opinion of his treating cardiologist. Here, there is substantial evidence in the record as a whole to support the ALJ's determination that Eberhart was capable of performing light work, with some restrictions that did not include absenteeism. Because the ALJ's RFC determination is supported by some medical evidence and is properly based on the record as a whole, the ALJ did not err in failing to include absenteeism as a limitation in his RFC.

Eberhart also argues that the ALJ's decision should be reversed because the hypothetical question posed to the vocational expert did not include absenteeism as an impairment. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." <u>Hinchey v. Shalala</u>, 29 F.3d 428, 432 (8th Cir. 1994). The vocational expert testified that a hypothetical individual with Eberhart's education, training, and work experience could perform work as an information clerk or call out operator if that individual were also limited by an ability to lift 20 pounds occasionally and 10 pounds frequently, stand/walk for two hours out of eight, sit six hours out of eight, climb stairs and ramps occasionally and a need to avoid extreme temperatures and hazards and change positions

frequently.  When questioned by Eberhart's counsel, the vocational expert also testified that being absent two days per month would make it very difficult to maintain employment.

After engaging in a proper credibility analysis, the ALJ properly incorporated into Eberhart's RFC only those impairments and restrictions found credible.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").  It was not error to exclude absenteeism from his hypothetical question to the vocational expert or to disregard her response to counsel's question as "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  Hinchey, 29 F.3d at 432.  For the reasons set out above, substantial evidence on the record as a whole does not support a finding of absenteeism as one of Eberhart's limitations. As the ALJ's question to the vocational expert incorporated the same limitations as Eberhart's RFC and was properly formulated, the expert's testimony that Eberhart could perform other work constitutes substantial evidence supporting the ALJ's decision that Eberhart is not disabled.  See Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) ("Testimony from a VE [vocational expert]  based on a properly phrased hypothetical question constitutes substantial evidence.").  I find

that substantial evidence as a whole supports the ALJ's decision to deny benefits because Eberhart is not disabled.

## Conclusion

Because substantial evidence in the record as a whole supports the ALJ's decision to deny benefits, I will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accord with this Memorandum and Order is entered this date.



_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 13th day of August, 2014.